Filed 3/19/15  In re J.Z. CA6

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SIXTH APPELLATE DISTRICT

| | |
|---|---|
| In re J.Z., a Person Coming Under the Juvenile Court Law. | H041601 (Santa ClaraCounty Super. Ct. No. 113JD21737) |
| SANTA CLARA COUNTY DEPARTMENT OF FAMILY AND CHILDREN'S SERVICES, Plaintiff and Respondent, v. D.B., Defendant and Appellant. | |

D.B., the mother of J.Z., (mother) appeals from the September 22, 2014 order that terminated parental rights and selected adoption as the permanent plan for J.Z.  Mother contends that the juvenile court erred by finding that the beneficial parent-child relationship exception to adoption and termination of parental rights (Welf. & Inst. Code, § 366.26, subd. (c)(1)(B)(i))[1] did not apply.  Mother maintains that there is an emotional bond between her daughter and herself and the only permissible inference is that J.Z. will be greatly harmed by the loss of their relationship.

---

[1]     All further statutory references are to Welfare and Institutions Code unless otherwise specified.

I

*Procedural History and Facts*

A. *Background Procedural History*

On March 8, 2013, a juvenile dependency petition was filed on behalf of J.Z., who was then less than 18 months old. It alleged that J.Z. came within the jurisdiction of the court under section 300, subdivision (b) (failure to protect). On March 12, 2013, a first amended petition was filed under section 300, subdivision (b). Both petitions alleged that mother had a substance abuse problem and mental health issues, the parents had a history of domestic violence, both parents had a criminal history, and father was incarcerated on pending felony charges.

At the hearing on March 13, 2013, juvenile court ordered J.Z. detained and temporarily removed from the physical custody of mother and father. The court ordered supervised visitation for mother a minimum of two hours twice a week and supervised visitation for father a minimum of two hours twice a week upon his release from custody. While he was locally incarcerated, father was entitled to a one hour visit once a week.

The Jurisdiction/Disposition Report, dated April 3, 2013, stated that J.Z. had been placed with her paternal grandmother on March 26, 2013. The addendum report dated April 22, 2013, stated that J.Z. was doing well in her grandmother's care and her needs were being met. With regard to mother's visitation, mother had been consistent with her visits and J.Z. had enjoyed spending time with her.

On April 22, 2013, the juvenile court sustained the first amended petition as amended on its face. The court declared J.Z. a dependent child of the court. The court removed J.Z. from parental custody and ordered J.Z. into the Department's care, custody, and control for placement in an approved home of a relative or non-relative extended family member. The court ordered family reunification services for both parents. As to visitation for mother, the court ordered supervised visitation a minimum of twice a week for two hours per visit. It ordered supervised visitation for father a minimum of once a

2

week for one hour while he was locally incarcerated; the paternal grandmother was to take J.Z. "with her during her regular weekly visits."

The status report for the 6-month review hearing stated that J.Z. continued to reside with the paternal grandmother. The summary of mother's drug testing results from March 22, 2013 to September 20, 2013 disclosed numerous no-shows and several positive results for various substances, including methamphetamine. The report indicated that mother had a pattern of being tardy to visits, resulting in some cancellations. The bulk of mother's successful visits had occurred when J.Z. had been brought to mother while she was in an inpatient drug program. "Those visits are enjoyed by the minor as she is happy to see [mother]. They laugh a lot during the visits and both [J.Z. and mother] would seem affectionate toward each other." It was reported that mother continued to struggle with her court-ordered case plan and drugs. Father was still in jail.

An addendum report dated November 14, 2013 indicated mother was in jail. The social worker had visited mother there on October 30, 2013.

At the 6-month review hearing on November 14, 2013, the court ordered parents to continue receiving family reunification services. As to visitation for mother, the court ordered supervised visitation a minimum of twice a week for two hours per visit upon her release from custody but allowed visitation if mother was in the PACT program.

The status review report for the 12-month hearing, dated April 21, 2014, indicated that J.Z. continued to reside with her paternal grandmother. J.Z. appeared happy and emotionally healthy. J.Z. was bonded to the paternal grandmother. According to J.Z.'s therapist, the paternal grandmother had reported that J.Z. enjoyed the time with mother but J.Z. was upset when it was time to leave.

The report further indicated that mother had been incarcerated from October 15, 2013 to February 13, 2014 for a violation of probation granted on a petty theft conviction. Since her release, mother had failed to report to her probation officer. The summary of mother's drug testing results from September 20, 2013 to April 9, 2014, reflect numerous

3

no-shows, a period of incarceration, and a positive drug test result for methamphetamine on February 27, 2014 followed by more no-shows. On March 12, 2014, mother had shown up for a visit at the Department's office reeking of marijuana. Mother denied using marijuana and she was asked to voluntarily submit for a drug test; she left without submitting to the test. Father had been incarcerated since October 23, 2012 and he was still in jail.

At the 12-month review hearing, held on May 12, 2014, the juvenile court terminated family reunification services. It set the section 366.26 hearing. As to visitation for mother, the court ordered supervised visitation a minimum of once a week for two hours.

B. *Section 366.26 Hearing*

At the section 366.26 hearing on September 15, 2014, the juvenile court admitted the social worker's 366.26 WIC Report, dated September 3, 2014, with minor modifications made orally by the Department's counsel. The report recommended that the court terminate parental rights. Mother had continued to visit J.Z. under the supervision of the Department twice a week for two hours per visit. The report stated that J.Z. continued to reside with her paternal grandmother. During a home visit on June 24, 2014, the grandmother mentioned that, when J.Z. prays at night, she says, "Bless my mommy . . . ."

The report stated that the proposed permanent plan for J.Z. was adoption. J.Z. was bonded to her paternal grandmother. J.Z. presented as a happy child and appeared emotionally healthy. According to J.Z.'s therapist, J.Z. appeared to be doing well in the home of the grandmother and was adjusting well to preschool. The report described J.Z. as "a vibrant and healthy toddler." J.Z.'s interactions with her paternal grandmother "show[ed] a strong bonding that is usually evident in a healthy child-parent relationship." The paternal grandmother was the prospective adoptive parent and J.Z. perceived her as her parent. The grandmother had demonstrated the ability to care for J.Z. and meet all

4

her developmental needs and, in the social worker's opinion, she was "best able to care for and nurture [J.Z.] on a daily basis."

The social worker, Anthony Nkwo-Okere (hereinafter Okere), was made available for cross-examination. Okere acknowledged that he authored the 12-month review report, dated April 21, 2014. He confirmed that while mother was in custody during the period of reunification services, J.Z.'s grandmother took her to jail to visit with mother. In the 12-month report, Okere had indicated that J.Z. "usually enjoys her visits with [mother] and she's happy to see [mother]." He had written that "they laugh a lot during visits, and [mother] would tell [J.Z.] that she loves her."

Okere had supervised some of the recent visits between mother and J.Z. He confirmed that his description of mother's visits with J.Z. in the 12-month review report was still accurate. As to the visits that he did not supervise, visitation logs entries indicated that mother was affectionate toward J.Z. and J.Z. appeared to enjoy mother's visits.

Okere had been assigned to the case on May 1, 2013. He had regular contact, at least monthly, with J.Z. and he had observed her in her foster home. He also had monthly contact with mother.

Mother had visitation with J.Z. twice a week since the beginning. As the result of being late, mother had missed about eight visits between the 12-month review[2] and September 15, 2014. Mother had been consistently late. Sometimes mother would not show up after J.Z. had waited an hour for her to come. Okere had begun requiring mother to call two hours in advance of a visit and to arrive an hour before the visit at which point someone would pick up J.Z. for the visit.

Okere had supervised visits between mother and J.Z. about 10 times. He had reviewed about 98 percent of the reports generated from the visits supervised by another

---

[2] The 12-month review hearing was held on May 12, 2014.

5

social worker from the Department. Based on his own observations and the visitation reports he had read, Okere characterized the relationship between mother and J.Z. as being "like friends." In his opinion, mother did not play a parental role in J.Z.'s life. J.Z. did not comply with mother's directives. Okere acknowledged, however, that J.Z. called mother "Mommy" or "Mom."

Mother testified that she was J.Z.'s primary caretaker until J.Z. was about one and a half years old, when J.Z. was removed from her care. Before removal, mother took care of J.Z. every day, bathed her, and cooked for her. Once J.Z. was removed from mother's care, the juvenile court had ordered a minimum of twice-a-week visitation and mother had visited consistently. The visits were two hours long. As to the eight visits that she had missed due to tardiness during recent months, mother explained that she did not have transportation or a bus pass.

According to mother, when J.Z. first sees mother during a visit, J.Z. "says, Mommy, and runs to [her]." J.Z. tells mother that she loves mother "all the time." At the visit, they "play patty-cake," and mother gives a present or something she has brought to J.Z. When asked about J.Z.'s reaction at the end of visits, mother testified that "[i]n the beginning," J.Z. screamed, sometimes hit her grandmother, and tried to go back to mother at the end of visits. Mother testified that the social worker had been there when J.Z. did not want mother to leave and cried.

Mother believed that it would be helpful for J.Z. to continue her relationship with her. Mother had been in foster care herself and met her mother when she was 17 years old. She did not want her daughter to hate her. Mother stated: "She's the only thing I have right now. I don't have family. I'm on my own right now. . . ."

In rebuttal, Okere confirmed that he had recommended a permanent plan of adoption for J.Z., who recently turned three years old. One reason for his recommendation was her age. He explained: "That age compels that she be raised in a family setting where she's able to establish a good relationship with a parental figure.

6

That way she's able to attach in a healthy fashion and then hopefully thrive in that process." In his opinion, it was more beneficial to J.Z. to be adopted than to maintain her relationship with mother. Adoption would provide stability and permanence. J.Z.'s current caretaker, her grandmother, wished to adopt J.Z.

On September 22, 2014, the juvenile court rendered its decision. It found the following facts. Mother had maintained frequent and loving contact with J.Z., their visits were pleasant, and they shared an emotional bond. J.Z. was three years old and she had spent over half of her life with her grandmother and away from her mother. J.Z.'s daily physical and emotional needs had been met by her grandmother with whom J.Z. had formed a strong, healthy bond. J.Z. looked to her grandmother for guidance, nurturance, and support. The court found no compelling reason to conclude that termination of parental rights would be detrimental to J.Z.

The juvenile court then found by clear and convincing evidence that adoption was likely. It terminated the parental rights of mother and father. It ordered a permanent plan of adoption and referred J.Z. to the County Adoption Agency for adoptive placement.

II

*Discussion*

At a section 366.26 hearing, the juvenile court has limited choices. Unless a statutory exception applies, the court is required to terminate parental rights and order the dependent child placed for adoption once it determines under a clear and convincing evidence standard that it is likely that the child will be adopted. (§ 366.26, subd. (c)(1).) "The Legislature has thus determined that, where possible, adoption is the first choice." (*In re Celine R.* (2003) 31 Cal.4th 45, 53.)

"The specified statutory circumstances—actually, *exceptions* to the general rule that the court must choose adoption where possible—'must be considered in view of the legislative preference for adoption when reunification efforts have failed.' [Citation.] . . . The statutory exceptions merely permit the court, in *exceptional circumstances* [citation],

7

to choose an option other than the norm, which remains adoption." (*In re Celine R.*, *supra*, 31 Cal.4th at p. 53.)

Section 366.26, subdivision (c)(1)(B), contains a number of exceptions to the mandate of adoption, including the beneficial parent-child relationship exception. (§ 366.26, subd. (c)(1)(B)(i).) That exception applies where "[t]he court finds a compelling reason for determining that termination would be detrimental to the child [because] [t]he parents have maintained regular visitation and contact with the child and the child would benefit from continuing the relationship." (*Ibid.*)

A parent bears the burden of proving the beneficial parent-child relationship exception applies. (*In re Mary G.* (2007) 151 Cal.App.4th 184, 207.) The parent-child relationship must promote "the well-being of the child to such a degree as to outweigh the well-being the child would gain in a permanent home with new, adoptive parents." (*In re Autumn H.* (1994) 27 Cal.App.4th 567, 575.) "In other words, the court balances the strength and quality of the natural parent/child relationship in a tenuous placement against the security and the sense of belonging a new family would confer. If severing the natural parent/child relationship would deprive the child of a substantial, positive emotional attachment such that the child would be greatly harmed, the preference for adoption is overcome and the natural parent's rights are not terminated." (*Ibid.*)

On appeal from a court order terminating parental rights following a determination the beneficial parent-child relationship exception is inapplicable, we review the juvenile court's findings of fact under a substantial evidence standard and its discretionary decision regarding the existence of a compelling reason under an abuse of discretion standard. (See *In re Bailey J.* (2010) 189 Cal.App.4th 1308, 1314-1315; see *In re K.P.* (2012) 203 Cal.App.4th 614, 621-622; *In re C.B.* (2010) 190 Cal.App.4th 102, 123; but see *In re G.B.* (2014) 227 Cal.App.4th 1147, 1166 & fn. 7.) "Since the proponent of the exception bears the burden of producing evidence of the existence of a beneficial parental . . . relationship, which is a factual issue, the substantial evidence standard of

8

review is the appropriate one to apply to this component of the juvenile court's determination." (*In re Bailey J.*, *supra*, at p. 1314.) A juvenile court's determination whether there is a compelling reason not to terminate parental rights based on a beneficial parent-child relationship is "a 'quintessentially' discretionary decision, which calls for the juvenile court to determine the *importance* of the relationship in terms of the detrimental impact that its severance can be expected to have on the child and to weigh that against the benefit to the child of adoption. (*In re L.Y.L.* (2002) 101 Cal.App.4th 942, 951.) Because this component of the juvenile court's decision is discretionary, the abuse of discretion standard of review applies." (*Id*. at p. 1315; see *In re C.B.*, *supra*, at p. 123.)

" [']The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.' [Citation.]" (*In re Stephanie M*. (1994) 7 Cal.4th 295, 318-319.) Mother has not demonstrated that the court abused its discretion.

In *In re S.B.* (2008) 164 Cal.App.4th 289 (*S.B.*), which is cited by mother, a bonding study conducted by Dr. Robert Kelin was admitted into evidence at the section 366.26 hearing. (*S.B.*, *supra*, at p. 295.) "Dr. Kelin concluded that, because the bond between [S.B.'s father] and S.B. was fairly strong, there was a potential for harm to S.B. were she to lose the parent-child relationship." (*Id*. at p. 296.) At the time of the section 366.26 hearing, S.B. was about five years old. (See *S.B.*, *supra*, at pp. 293, 295.) S.B.'s father had been her primary caregiver for three years. (*Id*. at p. 298.) "His devotion to S.B. was constant, as evinced by his full compliance with his case plan and continued efforts to regain his physical and psychological health." (*Id*. at p. 300.) S.B.'s father had "maintained a parental relationship with S.B. through consistent contact and visitation." (*Ibid*.) "S.B. derived comfort, affection, love, stimulation and guidance from her continued relationship with [her father]." (*Ibid*.) "S.B. loved [her father] and wanted

9

their relationship to continue." (*Id*. at p. 298.)  The appellate court concluded that "[t]he record here fully supports the conclusion [S.B.'s father] continued the significant parent-child relationship *despite* the lack of day-to-day contact with S.B. after she was removed from his care.  [Citation.]" (*Id*. at p. 299.)  The appellate court determined that the juvenile court had "erred when it found the continuing beneficial relationship exception did not apply and terminated parental rights. (§ 366.26, subd. (c)(1)(B)(i).)" (*S.B*., supra at p. 301.)

The same appellate court that decided *S.B.* subsequently stated in another case: "The *S.B.* opinion must be viewed in light of its particular facts.  It does not, of course, stand for the proposition that a termination order is subject to reversal whenever there is 'some measure of benefit' in continued contact between parent and child." (*In re Jason J*. (2009) 175 Cal.App.4th 922, 937.)  The same court reiterated the exceptional nature of the *S.B*. decision in *In re C.F*. (2011) 193 Cal.App.4th 549, stating:  "[W]e once again emphasize that S.B. is confined to its extraordinary facts.  It does not support the proposition a parent may establish the parent-child beneficial relationship exception by merely showing the child derives some measure of benefit from maintaining parental contact.  As *Autumn H*. points out, contact between parent and child will always 'confer some incidental benefit to the child,' but that is insufficient to meet the standard. (*Autumn H*., *supra*, 27 Cal.App.4th at 575.)" (*Id*. at pp. 558-559.)

In this case, there was no bonding study indicating that termination of mother's parental rights would be detrimental to J.Z.  Even though mother had maintained regular visitation and contact with J.Z. and they enjoyed a positive, caring relationship, mother was still required to demonstrate that benefits of continuing that relationship outweighed the benefits of adoption.  Under the deferential abuse of discretion standard, we cannot conclude that the juvenile court acted outside the bounds of reason in finding the beneficial parent-child relationship exception did not apply.

## DISPOSITION

The juvenile court's order terminating parental rights and selecting adoption as the permanent plan is affirmed

_____

ELIA, J.

WE CONCUR:


_____

RUSHING, P. J.



_____

PREMO, J.